IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TRACY RENEE MOORE, ET AL.        *

                                 *   CIVIL NO. SKG-05-1496

WAUKER LEIGH MATTHEWS, ET AL.    *


## MEMORANDUM OPINION

The case involves a maritime dispute stemming from a jet ski accident at the 2002 Kent County High School senior class picnic. Pending before the Court is Defendant Wauker Leigh Matthews' ("Defendant") Motion for Summary Judgment with respect to all claims made by Tracy Renee Moore, Allan E. Moore, and Dorothy Moore ("Plaintiffs"). (Paper No. 55). The issue is fully briefed. A hearing was held on August 22, 2006. For the reasons discussed below, defendant's motion for summary judgment is hereby GRANTED in part and DENIED in part.

I.   **Factual Background**

The following facts are undisputed. On June 6, 2002, the Kent County High School held its senior class picnic at Drayton Retreat Center. Drayton Manor is a thirty-three acre parcel of land along Still Pond Creek just off the Chester River.

After lunch, several students, including plaintiff Tracy Moore ("plaintiff Moore"), Brittany Garvey, and defendant went down to the beach area where two students, Robert Bramble and Matthew Kennedy, were operating their jet skis. (Paper No. 58,

Exh. B at 3).  Robert Bramble was operating a Bombardier SeaDoo that was owned by his aunt.  Bramble stated that the SeaDoo can be driven more than sixty-three miles per hour.  (Paper No. 64, Exh. 1 at 2).  Matthew Kennedy was operating a Yamaha that was owned by his older brother.  Kennedy's jet ski could go sixty-five miles per hour in perfect conditions.  (Paper No. 55, Exh. 11 at 2).  For approximately the next forty-five minutes, Bramble and Kennedy transported students around the creek on their jet skis.  (Paper No. 58, Exh. B at 3).

Garvey asked Kennedy to let her take out the jet ski with plaintiff Moore.  (Id. at 3-4).  He agreed.  Plaintiff Moore and Garvey drove the Kennedy jet ski around the bend to a cove, where they took turns operating the jet ski.  (Paper No. 55, Exh. 4 at 3).  Plaintiff Moore had only used a jet ski once before; in 2002 she had driven a jet ski for an hour.  (Paper No. 55, Exh. 8 at 3).  Plaintiff Moore does not have a boat license, and has only been on a boat twice before.  (Id.)

Subsequently, defendant asked Robert Bramble if he could use the Seadoo Bombadier.  (Paper No. 58, Exh. D at 5).  Defendant had used a jet ski previously, and had his boater safety license.  (Paper No. 55, Exh. 8 at 3).  To receive the boater safety license, he had to attend a series of classes and take a test.[1]

---

[1] The Court would be interested in evidence on the content of the classes and tests for the boater safety license at the trial.

(Id.).  Defendant spent ten minutes on the jet ski, cruising around the cove.  (Paper No. 55, Exh. 3 at 3-4).  He does not recall how fast he was going, or whether any other jet skis or boats were on the water.  (Id.)

After Matthew Kennedy asked defendant to tell plaintiff Moore and Garvey to return to shore, defendant drove his jet ski out to the cove.  (Paper No. 55, Exh. 3 at 6).  When he reached plaintiff Moore and Garvey, defendant told them it was time to head back.  (Paper No. 55, Exh. 4 at 3).  Both jet skis then started driving back to shore.  (Id.)  Plaintiff Moore was driving the Kennedy jet ski, and Garvey was the passenger.  (Paper No. 55, Exh. 4 at 5).  Defendant testified that as they left the cove the Kennedy jet ski was in front of him and to his right.  (Paper No. 59, Exh. 1 at 8).  To get a better line into shore, defendant changed course so that plaintiff was on his port side.  (Id.).  He was around 40 yards or 120 feet behind plaintiff's jet ski, and he maintained this distance as they headed back to shore.  (Id. at 8).

Garvey testified that plaintiff Moore drove the jet ski back really fast, almost at top speed.  (Paper No. 55, Exh. 4 at 6).  She knew plaintiff Moore was racing defendant back to shore, but Garvey never looked to see how fast he was driving or where his jet ski was.  (Id. at 6, 11, 12).  Robert Bramble testified that he saw both jet skis heading back to shore.  He estimates that

the jet skis were moving "as fast as they could go", but plaintiff Moore was moving faster than the defendant.  (Paper No. 64, Exh. 1 at 2).

Because Garvey and plaintiff Moore lost track of defendant, plaintiff Moore started to slow down and looked back over her shoulder, causing the boat to veer to the left or right.  (Paper No. 55, Exh. 4 at 7, 12).  Ultimately, the jet ski turned into a sharp, unexpected 180 degree turn.  Because Garvey was not prepared for the turn, she fell backwards off to the left of the jet ski backwards to the side.  (<u>Id.</u> at 7).

All of a sudden, defendant recalls seeing the other jet ski turn 180 degrees, so that it faced him.  (Paper No. 59, Exh. 1 at 9).  As the jet ski turned, defendant saw Garvey fall into the water.  (<u>Id.</u> at 7).  He knew Garvey was in the water to his left, no more than five feet away from the other jet ski.  (<u>Id.</u> at 7).  The jet ski and plaintiff Moore were slightly to his right.  (Id. at 8).  Defendant did not want to hit Garvey in the water, and he felt at that time that he had a better chance of avoiding a collision if he turned to the right.  (Paper No. 59, Exh. 1 at 6-7).

Defendant concluded there was going to be a collision when he was about ten feet away from the accident.  (<u>Id.</u> at 5).  From that moment until the collision, he testified that no more than thirty seconds passed. (Paper No. 55, Exh. 3 at 5)  Ultimately,

4

defendant collided head on with the other jet ski.

When Garvey surfaced, a couple of seconds later, the jet skis had already collided.  (Paper No. 58, Exh. B at 5-6). Plaintiff Moore has no recollection of the incident.  (Paper No. 58, Exh. A at 2).  No one else witnessed the collision.

After the collision, defendant swam back to plaintiff Moore to ensure she was all right.  Ultimately, he helped assist plaintiff Moore back to shore.  (Paper No. 55, Exh. 3 at 8).  As a result of the collision, plaintiff Moore suffered multiple damages.

The following fact is in dispute.  Plaintiff Dorothy Anne Moore stated that defendant told her on the day following the accident at the hospital that he was going too fast to stop. (Paper No. 58, Exh. H at 2).  Although defendant remembered visiting plaintiff Moore at the hospital, he does not recall making this statement.  (Paper No. 59, Exh. 1 at 3).  As will be discussed below, the parties disagree as to what reasonable inferences may be drawn from the facts.

## II.  Standard of Review

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P.

56(c).  Thus, summary judgment is appropriate when it is clear
that no genuine issue of material fact remains unresolved and an
inquiry into the facts is unnecessary to clarify the application
of the law.  Haavistola v. Community Fire Co. of Rising Sun, 6
F.3d 211, 214 (4th Cir. 1993).  A material dispute exists if the
facts may affect the outcome of the suit under the governing law.
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct.
2505, 2510 91 L.Ed.2d 202 (1986).

     The moving party has the burden of initially showing the
absence of a genuine issue concerning any material fact.  Adickes
v. S.H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142
(1970).  Then the burden shifts to the nonmoving party to "make a
showing sufficient to establish the existence of an element
essential to that party's case and on which that party will bear
the burden of proof at trial."  Celotex Corp. v. Catrett, 477
U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  When a
nonmoving party fails to make such showing, summary judgment is
appropriate because the nonmoving party would be unable to
establish an element of her claim at trial.  Id.

     To survive summary judgment, the nonmoving party must
produce "specific facts showing that there is a genuine issue for
trial," and may not rest upon the "bald assertions of his
pleadings."  FED. R. CIV. P. 56(e).  Summary judgment is
inappropriate if a reasonable factfinder could find for the

nonmoving party at trial.  <u>Anderson v. Liberty Lobby</u>, 477 U.S.
242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

At the summary judgment stage, the court must view the
evidence and inferences to be drawn from that evidence "in the
light most favorable to the non-moving party."  The non-moving
party is to "have the credibility of his evidence as forecast
assumed, [and] all internal conflicts in it resolved favorably to
him."  <u>Miller v. Leathers</u>, 913 F.2d 1085, 1087 (4th Cir. 1990)
(quoting <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th
Cir. 1979)).  However, if the nonmoving party bears the burden of
proof at trial, summary judgment may be granted if the nonmoving
party fails to adduce evidence to support an essential element of
the claim.  <u>See</u> <u>Moore's Federal Evidence</u> § 56.11[1][b].

### III.  <u>Analysis</u>

In the complaint, plaintiffs alleged that defendant was
negligent in his handling of the jet ski.  As a direct and
proximate result of the negligence, Plaintiff Tracy Moore and her
parents, plaintiffs Allen and Dorothy Moore suffered damages.
(Paper No. 1 at 2-3).  Defendant Matthews now moves for summary
judgment with respect to all claims made against him by the
plaintiffs, because the evidence fails to show that he was
negligent or otherwise not in compliance with the Inland
Navigational Rules.  He contends that the evidence shows
plaintiff Tracy Moore's negligence was the sole cause of the

7

accident.[2]  (Paper No. 55).

The case is controlled by admiralty law, because the collision occurred on navigable waters and had a substantial connection to traditional maritime activities.  <u>See</u> <u>Yamaha Motor Corp. v. Calhoun</u>, 516 U.S. 199, 206, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996); <u>Mullenix v. United States</u>, 984 F.2d 101, 104 (4th Cir. 1993).  Negligence under admiralty law is simply the failure to use reasonable care under the circumstances.  <u>National Shipping Co. of Saudia Arabia v. Moran Mid-Atlantic Corp.</u>, 924 F.Supp. 1436, 1450 (E.D. Va. 1996)(<u>citing</u> 8 Benedict on Admiralty § 3.02[B][4]).  <u>See also</u> <u>Slobodna Plovidba v. King</u>, 688 F.Supp. 1226, 1234 (W.D. Mich. 1988)(citing <u>Dalldorf v. Higgerson-Buchanan, Inc.</u>, 402 F.2d 419, 423 (4th Cir. 1968) ("Negligence will not attach to the navigator of a ship unless he or she makes a decision which nautical experience and good seamanship would condemn as unjustifiable at the time and under the circumstances of the accident.").

 To prevail on their negligence claims, plaintiffs must establish the existence of a duty, a breach of that duty, and an

---

[2] In the alternative, defendant argues that plaintiffs Allen E. Moore's and Dorothy Moore's claims should be limited so as to not recover medical expenses after plaintiff Moore was no longer a minor. (Paper No. 55 at 9).  In response, plaintiffs agree that Allen and Dorothy Moore have only brought a claim for medical expenses incurred while plaintiff Tracy Moore was a minor, and that Tracy Moore's claim encompasses her medical bills after she reached majority.  As a result, the issue is moot, as defendant conceded at the hearing.

injury proximately resulting from the breach of that duty. Schumacher v. Cooper, 850 F.Supp. 438, 447 (D.S.C. 1997). See also Thomas J. Schoenbaum, Admiralty and Maritime Law § 5-2 (4th ed. 2001). However, under the Pennsylvania Rule, if defendant failed to comply with a statute designed to prevent collisions, the burden shifts to him to show that the violation could not have been the cause of the accident. The Pennsylvania, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1873); National Shipping Co. of Saudia Arabia v. Moran Mid-Atlantic Corp., 924 F.Supp. 1436, 1450 (E.D. Va. 1996)(citing 8 Benedict on Admiralty § 3.02[B][4]); Crowley American Transport, Inc. v. Double Eagle Marine, Inc., 208 F.Supp.2d 1250, 1264 (S.D. Ala. 2002).

When two or more parties have contributed by their fault to cause damages in a maritime collision such damages will be allocated among the parties proportionally to the comparative degree of fault. See United States v. Reliable Transfer Co., Inc., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). As a result, contributory negligence is not a complete bar to the plaintiff's recovery, but merely mitigates damages. Id.; Exxon Co., U.S.A. v. Sofec, Inc., 517 U.S. 830, 837, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996); Stolt Achievement, Ltd. v. Dredge B.E. Lindholm, 447 F.3d 360 (5th Cir. 2006); Crowley American Transport, Inc. v. Double Eagle Marine, Inc., 208 F.Supp.2d 1250 (S.D. Ala. 2002); Hogge v. SS Yorkmar, 434 F.Supp. 715 (D. Md.

1977).  <u>See also</u> Thomas J. Schoenbaum, <u>Admiralty & General</u>
<u>Maritime Law</u> § 5-5 (4th ed. 2001).  "Where both parties to a
collision are in violation of statutes designed to prevent
collisions, the court may apportion fault between the parties,
unless either party proves that its statutory violation was not a
substantial contributing cause of the collision."  <u>Stolt</u>
<u>Achievement, Ltd. v. Dredge B.E. Lindholm</u>, 447 F.3d 360, 364 (5th
Cir. 2006).

     A.    Whether Defendant Violated the Inland Navigational
         Rules

    Plaintiffs allege that defendant Matthews violated Rules 5,
6, 7, 8, 13, and 16 of the Inland Navigational Rules, as codified
by 33 U.S.C. §§§§ 2001 through 2073.[3]

    1.  <u>Rule 5</u>

    Under Rule 5, "every vessel shall at all times maintain a
proper look-out by sight and hearing as well as the available
means appropriate in the prevailing circumstances and conditions,

---

[3] "The Inland Navigation Rules encompass long-standing steering
and sailing rules and principles, otherwise known as 'Rules of the
Road', which govern navigation on inland waters. These rules have
existed in various forms over the years, the latest version
representing a unification of rules and related regulations which were
codified by the Inland Navigational Rules Act of 1980, 33 U.S.C. §§§§
2001 through 2073. These Congressionally sanctioned rules of
navigation designed to prevent collision are based upon the
fundamental principle that the vessel better able to control her
movements should give way to a less able vessel. Indeed, anyone who
undertakes operation of vessels on navigable waters is charged with
knowledge of the INR and a mandatory duty to obey them." <u>Turecamo</u>
<u>Maritime, Inc. v. Weeks Dredge No. 516</u>, 872 F.Supp. 1215, 1229
(S.D.N.Y. 1994)(internal citations omitted).

so as to make a full appraisal of the situation and of the risk of collision."  33 U.S.C. § 2005.

"The question of sufficiency of a lookout is in any instance one of fact to be realistically resolved under the attendant circumstances, bearing in mind that the performance of lookout duty is an inexorable requirement of prudent navigation... If a vessel has not properly performed its lookout duty, burden rests on vessel to exculpate itself from liability." Nicholes v. M/V Maya, 949 F.Supp. 391, 398 (D.S.C. 1996)(citing Anthony v. International Paper Co., 289 F.2d 574 (4th Cir. 1961)).

"If the lookout fails to see lights or vessels which proper watchfulness would have disclosed, the fact unexplained is conclusive evidence of a defective lookout." Moran Towing & Transp. Co., Inc. v. City of New York, 620 F.2d 356, 358 (2d Cir. 1980)(quoting J. Griffin, The American Law of Collision § 112 (1949).  Accord Mystic S.S. Corp. v. M/S Antonio Ferraz, 498 F.2d 538, 541 (2d Cir. 1974); Rautboard v. Ehmann, 190 F.2d 533, 538 (7th Cir. 1951)(failure of lookout to see object in bright daylight with nothing to obstruct his vision may be ample grounds for a Court to determine that a lookout was not appropriate or proper).

However, if a vessel is aware of all information which could have been discovered by a lookout, the evidence establishes that

the absence of the lookout was not a cause of the collision.  See Osaka Shosen Kaisaha v. Angelos, Leitch, & Co., 301 F.2d 59, 61 (4th Cir. 1962)(even if special lookout was obligatory, because all that was fairly observable was seen, and nothing foreshadowed the action, the evidence is clear and convincing that absence of lookout was not a cause of the collision); Daniels v. Trawler Sea-Rambler, 294 F.Supp. 228, 231-2 (E.D. Va. 1996)(same); Folkstone Maritime, Ltd. V. CSX Corp., 64 F.3d 1037, 1053 (7thCir. 1995)(a ship may be negligent for failure to post a lookout, but not be held at fault where the information to be gained by the lookout was already known).

Here, plaintiffs argue that a reasonable factfinder could conclude that defendant failed to keep a proper lookout, because he testified that he did not have an "inkling" that the jet skis would collide until they were ten feet apart.  (Paper No. 57, Exh. F at 8).

First, the Court disagrees with plaintiff's interpretation of defendant's testimony.  (Paper No. 57, Exh. F at 8).  After much back and forth in the deposition, defendant said that he concluded that there was going to be a collision when they were 10 feet apart.  The use of the work "inkling" was plaintiffs' counsel's in the question originally posed to defendant, which was followed by an extensive exchange only after which defendant answered, and then without adopting or utilizing that term.  His

12

statement may be read to mean not that he first saw the Moore jet ski when he was ten feet away, but that he considered a collision unavoidable at ten feet.  Second, no evidence has been presented which suggests that defendant Matthews was not an adequate lookout.  Plaintiff appears to simply infer the inadequacy of the lookout from the fact of the collision and stated distance of the two jet skis from each other.  Third, and perhaps most importantly, it is undisputed that defendant was aware of all pertinent information that could have been discovered by a lookout.  Defendant saw plaintiff Moore's jet ski unexpectedly turn 180 degrees, and saw Garvey fall into the water.  Defendant was aware of the positions of both Garvey and Moore following the accident.  (Paper No. 55, Exh. 3 at 6).  Whether defendant appropriately responded to this information is irrelevant as to whether a proper lookout was maintained.  See Moran Towing & Transp. Co., Inc. v. City of New York, 620 F.2d 356, 358 (2d Cir. 1980)(The lookout's duty is to look out and to report relevant and material information to the person in charge of navigation).  As a result, even viewing the evidence in the light most favorable to the non-moving party, no reasonable factfinder could conclude that plaintiff did not keep a proper lookout in violation of Rule 5.

    2.  Rule 6

    Under Rule 6, every vessel must "proceed at a safe speed so

that she can take proper and effective action to avoid collision
and be stopped within a distance appropriate to the prevailing
circumstances and conditions." 33 U.S.C. § 2006. "Under the new
rule, the prudent mariner must use his best judgment in
determining what constitutes safe speed for his vessel in order
that effective action can be taken to avoid collision." S. Rep.
96-979 (1980). The following factors should be considered in
determining what speed is safe: (i) the state of visibility; (ii)
the traffic density including concentration of fishing vessels or
any other vessels; (iii) the maneuverability of the vessel with
special reference to stopping distance and turning ability in the
prevailing conditions; (iv) at night the presence of background
light such as from shores lights or from back scatter of her own
lights; (v) the state of wind, sea, and current, and the
proximity of navigational hazards; and (vi) the draft in relation
to the available depth of water. 33 U.S.C. § 2006. <u>See also
Stolt Achievement, Ltd. v. Dredge B.E. Lindholm</u>, 447 F.3d 360
(5th Cir. 2006)(district court did not err when it defined safe
speed that required vessel to consider effect of speed on other
boats in vicinity). "If a vessel is traveling at such a high
rate of speed that it cannot take proper and effective action to
avoid a collision, such as turning to starboard when the threat
of collision is imminent, then the vessel is in violation of this
rule." <u>Todd v. Schneider</u>, 2003 WL 23514560 (D.S.C. 2003)

(unpublished).[4]

Viewed in the light most favorable to the non-moving party, evidence exists from which a reasonable factfinder could conclude that defendant Matthews was proceeding at an unsafe speed.  Both jet skis could travel between sixty and sixty-five miles per hour.  (Paper No. 55, Exh. 11 at 2; Paper No. 64, Exh. 1 at 2).  Bramble testified that he saw both jet skis headed back to shore at what he estimated was top speed, although he thought plaintiff Moore was driving faster. (Id.).  Garvey testified that plaintiff Moore was driving her jet ski at almost top speed, "really fast." (Paper No. 55, Exh. 4 at 6).  Defendant Matthews testified that he was 40 yards behind plaintiff Moore, and that he maintained that distance as they headed to shore.  (Paper No. 59, Exh. 1 at 8).  Moreover, plaintiff Moore's mother, plaintiff Dorothy Moore, testified that defendant Matthews told her the day after the accident that he was going too fast.[5]  Taken together, a reasonable inference from the facts is that defendant Matthews

---

[4] Other courts have defined a safe speed as the speed that would allow the vessel to stop within one-half of the distance forward of their bow.  See Woodford v. Carolina Power & Light Co., 798 F.Supp. 307, 311 (E.D.N.C. 1992); Williamson Leasing Co., Inc. v. American Commercial Lines, Inc., 616 F.Supp. 1330, 1340 (E.D. La. 1985). However, the definition does not appear to be applicable to the facts at hand.

[5] Defendant argues that he never made this statement.  However, for the purposes of summary judgment, the credibility of the non-moving party is assumed with all internal conflicts resolved in his favor.  See Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1994). As a result, for the purposes of summary judgment, the Court must find that the statement had been made.

drove his jet ski at a high rate of speed, approaching sixty-five miles per hour so as to maintain his distance behind the plaintiff.

Under Maryland's Personal Watercraft Regulations, a vessel is required to travel at seven miles per hour within 100 feet of another vehicle.  (Paper No. 55, Exh. 6).  The Court agrees with defendant that because he was more than 100 feet away from plaintiff, he was not required to travel seven miles per hour, under the regulations, but that does not, of course, mean that a driver is exercising the requisite due care if he travels at 65 mph or even 45 mph at 120 feet apart.

Given that the jet skis at issue have no brakes and that the jet skis were in close proximity, a reasonable factfinder could conclude that a speed of sixty-five miles per hour or indeed 45 mph was an unsafe speed, because defendant would be unable to take proper and effective action to avoid a collision at that speed.  One of the factors used to determine a safe speed is the "maneuverability of the vessel with specific reference to stopping distance and turning ability in the prevailing conditions."[6]  33 U.S.C. § 2006(a)(iii).  Defendant's own calculations demonstrate that there were only 1.8 seconds to

---

[6] Neither party has provided information on stopping distance or turning ability of the jet skis at the time of the hearing.  The Court would be interested in such information at the trial.

impact at 45 mph at 120 feet distance.[7]  This might suggest to the factfinder that even 45 mph would be an unsafe speed, as it allowed precious little time to avoid a collision.[8]

     3.  <u>Rule 7</u>

Under Rule 7, "every vessel shall use all available means appropriate to the prevailing circumstances and conditions to

---

[7]At the motions hearing, counsel for the plaintiff agreed that the Court may take judicial notice of the time it would take plaintiff to travel 120 feet to the other jet ski, if the facts established defendant was driving his jet ski at a particular speed.  FED. R. EVID. 201 (judicially noticed fact must be one not subject to reasonable dispute in that it is generally known within the territorial jurisdiction of the trial court).  <u>See also</u> McLaughlin, <u>Weinstein's Federal Evidence</u> § 201.11[1]; <u>Carpenter v. Norfolk & Western Railway Co.</u>, 145 F.3d 1330 (11th Cir. 1998)(unpublished)(taking judicial notice of general time/distance calculations); <u>Burlington Northern & Sante Fe Ry. Co. v. Poole Chemical Co., Inc.</u>, 2005 WL 1132851 (N.D. Tex. 2005)(unpublished) (court took judicial notice of calculations to determine the volume of a gallon of water).  Assuming that defendant was traveling 45 mph, or 66 feet per second, and that defendant drove the jet ski directly towards the plaintiff, the Court notes that it would only take defendant 2.06 seconds to crash into plaintiff Moore's jet ski.  If defendant was traveling 65 mph and all other facts remain the same, his jet ski would have collided with the other jet ski less than one second after the plaintiff Moore's jet ski spun into a 180 degree turn.

[8] Defendant argues that any violation of Rule 6 was not a cause of the accident, because even if his speed was safe he would not have had time to perceive and react to the situation before colliding with the plaintiff.  The burden is on defendant to establish that any violation of Rule 6 was not a cause of the accident.  However, as discussed below, defendant failed to submit any evidence concerning his perception-reaction time.  As a result, insufficient evidence exists for the Court to determine whether defendant could have perceived and responded effectively to the accident if he was driving at a lower rate of speed.  Moreover, because the burden is on the defendant, unless he introduces expert testimony or other admissible evidence regarding the perception-reaction time at trial, the Court is not convinced that the issue could be decided by the Court, as factfinder at trial either.  If either party believes a lay factfinder can make perception/reaction judgments, that party should present authorities supporting that view in advance of trial.

determine if risk of collision exists.  If there is any doubt such risk shall be deemed to exist."  33 U.S.C. § 2007.  "It is the risk of collision, not the collision itself, that masters must avoid."  C.G. Willis, Inc. v. The Spica, 6 F.3d 193, 196 (4th Cir. 1993).

Plaintiffs contend that defendant violated Rule 7, because once defendant saw Garvey fall into the water, he did nothing to ascertain the risk of collision.  Defendant responds that because plaintiff Moore did not signal to defendant that she was going to make a sudden 180 degree turn, defendant did not have sufficient time to react to avoid the collision.

Other than keeping a proper lookout, (which the Court has already determined was kept)[9] it is unclear what defendant should have done to <u>ascertain</u> the risk of a collision.  No evidence exists that radar or other navigational devices which would have given him additional information concerning a risk of collision. See, e.g. C.G. Willis, Inc. v. The Spicia, 6 F.3d 193, 198 (4th Cir. 1993)(Rule 7 is violated when party failed to utilize available radar to avoid collision).

At least one court has presumed from the fact that a collision occurred that a vessel failed to use all available

_____

[9] The plaintiffs declare that "Wauker . . . was not paying attention", (Paper 57-11), but Wauker testified to seeing Moore turn, Garvey fall off and Moore's jet ski "turning, turning and drifting." There is no evidence of inattention; plaintiffs appear to infer inattention solely from the fact of the accident.

means to ascertain whether a collision will occur.  <u>See</u> <u>Todd v.</u>
<u>Schneider</u>, 2003 WL 23514560 (D.S.C. 2003)(unpublished) (court
found the following actions shows defendant failed to determine
if a risk of collision existed: "traveling in excess of twenty-
five miles per hour, approaching a narrow and shallow channel
without the ability to see into the channel, making a turn north
around the west end of Sixteen Island at an excessive speed
instead of directly approaching the channel from the south, and
by turning his boat to port instead of to starboard just prior to
the collision").  However, unlike in <u>Todd</u>, defendant had a clear
line of sight, was maintaining a straight route back to shore,
and there was no indication that he turned his vessel in the
wrong direction prior to the collision.  Moreover, defendant's
jet ski was never directly behind the other jet ski.  (Paper No.
59, Exh. 1 at 8).  His original course was to the left of the
Kennedy jet ski.  Then, defendant altered his course to plaintiff
Moore's port side, so he could have a straighter path to shore.
(<u>Id.</u>).  Indeed, it is undisputed that if plaintiff Moore had not
unexpectedly altered her course, defendant could have passed her
without altering his course or otherwise causing an accident.
Defendant's actions are consequently not so reckless to create a
presumption that he violated Rule 7.

       As a result, no reasonable factfinder could conclude that
defendant failed to use all available means to ascertain whether

                                    19

a collision would occur.

    4.  Rule 8

    Rule 8 of the Inland Navigational Rules states in relevant part

> [a]ny action taken to avoid collision shall, if the
> circumstances of the case admit, be positive, made in
> ample time and with due regard to the observance of
> good seamanship.... If there is sufficient sea room,
> alteration of course alone may be the most effective
> action to avoid a close-quarters situation provided
> that it is made in good time, is substantial and does
> not result in another close-quarters situation.... If
> necessary to avoid collision or allow more time to
> assess the situation, a vessel shall slacken her speed
> or take all way off by stopping or reversing her means
> of propulsion.

33 U.S.C. § 2008.

    A navigator is not "called upon to divine the purpose of a meeting vessel, and at his peril to anticipate where she will be in accordance with her undisclosed purpose." The Halgrim, 20 F.2d 720, 721 (2d Cir. 1927)(Hand, Judge).  However, a navigator is required to take sufficient methods to avoid what should have been seen as a potentially dangerous situation.  Movable Offshore, Inc. v. M/V Wiliken A. Falgout, 471 F.2d 268 (5th Cir. 1973).  Rule 8 is violated if the vessel had safe means of avoiding the accident available and failed to use them.  United States v. M/V Wuerttemberg, 330 F.2d 498, 504 (4th Cir. 1964)("When safe means of avoidance of risk of collision are obviously and readily at hand, their neglect is inexcusable.").  Among the reasonable actions available to the navigator or driver

20

is the ability to slacken speed or stop vessel and a substantial and timely alteration of course.  See <u>Williamson Leasing Co., Inc. v. American Commercial Lines, Inc.</u>, 616 F.Supp. 1330, 1341 (E.D. La. 1985)(rule violated where vessel failed to slacken speed or otherwise respond to threat of collision); <u>Inland River Towing, Inc. v. American Commercial</u>, 143 F.Supp.2d 646 (N.D. Miss. 2000)(both pilots of ship at fault for continuing towards each other without slowing down to assess the situation).

A navigator's failure to comply with rules will be excused when special circumstances make the failure to follow the rules necessary to avoid immediate danger.  33 U.S.C. § 2002 ("In construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances including the limitations of the vessels involved, which may make a departure from these Rules necessary to avoid immediate danger.")  However, such extenuating circumstances must be strictly evaluated to justify precluding application of any given navigational rule.  See, e.g. <u>LuVuolo v. Gunning</u>, 925 F.2d 22, 26 (1st Cir. 1991).

Plaintiffs argue that defendant violated Rule 8, because he did not pull out the safety key, jump off the jet ski, or make a sharp 180 degree turn to avoid the collision.  (Paper No. 57 at 10-11).  Defendant responds that he did not have time to respond to the collision, but that his response of altering his course to

the right, as mandated by Rule 14 of the Navigational Rules[10], was appropriate.  (Paper No. 59 at 8).

It is not disputed that defendant did not attempt to slow down his jet ski after observing Garvey fall into the water and the sharp 180 degree turn of the other jet ski.[11]  Although defendant did attempt to steer his vessel to the right, no evidence establishes how far he attempted to alter his course or whether the alteration could have been sufficient.  See 33 U.S.C. § 2008 (while alteration of course may be an effective action to avoid the collision, the alteration must be both substantial and timely made).

While defendant argues that "Moore did not provide Matthews time in which to avoid the collision," (Paper 59 at 8), he failed to introduce any admissible evidence to support his theory.  See Miskin v. Baxter Healthcare Corp., 107 F.Supp.2d 669, 671 (D. Md. 1999)(at summary judgment, the court may only consider material which would be admissible or usable at trial); Solis v. Prince George's County, 153 F.Supp.2d 793, 798 (D. Md. 2001); Greensboro

---

[10] "Unless otherwise agreed, when two power-driven vessels are meeting on reciprocal or nearly reciprocal courses so as to involve risk of collision each shall alter her course to starboard so that each shall pass on the port side of the other."  33 U.S.C. § 2014.

[11] Turning off the jet ski would not have been an effective response, because the Maryland State training materials suggest that if defendant shut off the engine to the jet ski, he would have lost steering control of the vessel. (Paper No. 65, Exh. 1 at 7). However, it is not clear to the Court whether defendant could slow down the jet ski without shutting off the engine.  As a result, the issue must be decided at trial.

Prof'l Fire Fighters Ass'n, Local 3517 v. City of Greensboro, 64

F.3d 962, 967 (4th Cir. 1995).  See also Wright, Miller & Kane,

Federal Practice and Procedure § 2721 (2006).  First, defendant

relied on Forensic Aspects of Driver Perception and Response.[12]

However, because defendant failed to submit evidence sufficient

for the Court to find the treatise is both authentic under

Federal Rule of Evidence 901, and a learned treatise under

Federal Rule of Evidence 803(18), the Court lacks sufficient

evidence to conclude the treatise is not inadmissable hearsay.

See Miskin v. Baxter Healthcare Corp., 107 F.Supp.2d 669, 671 (D.

Md. 1999) (unauthenticated treatises were inadmissible hearsay

and thus not sufficient to preclude summary judgment).[13]

Defendant also relies on expert conclusions from the following

cases: LeBlanc v. Baxter, 905 So.2d 415, 424 (La.App. 5 Cir.

2005)(accepted standard in the accident reconstruction industry

for the minimum average reaction time of 1.5 seconds); Brooks v.

Bienkowski, 150 Md.App. 87, 104, 818 A.2d 1198 (2003) (the

---

[12] Olson, Paul, Forensic Aspects of Driver Perception and Response at 213, Lawyers and Judges Publishing Company (1996).

[13] Indeed, under the plain language of Federal Rules of Evidence 803(18), learned treatises are only admissible for the truth of the matter asserted "to the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination" and if they have been established as a reliable authority by an expert witness or judicial notice.  FED. R. EVID. 803(18).  Unless defendant intends to call an expert to testify concerning the perception/reaction time, it is unclear how defendant could introduce the treatise into evidence for the truth of the matter asserted.

average perception/reaction time is 1.6 seconds); and <u>Ramon v.</u>
<u>United States</u>, 2006 WL 381671 (D. Ariz. 2006)(expert concluded
that a PRT of 2 seconds was applicable under these circumstances
due to the nighttime conditions).[14]  However, defendant failed to
establish that he could produce evidence at trial concerning the
appropriate perception-reaction time, by testimony of experts or
otherwise.  <u>See</u> <u>Benekritis v. Johnson</u>, 882 F.Supp. 521, 529 n. 10
(D.S.C. 1995)(affidavit of experts retained after discovery ended
need not be considered by the court).  More importantly, even if
defendant could rely on testimony of experts in other cases at
trial, no showing has been made that these experts were
competent, had sufficient bases for their conclusions, or that
their conclusions were relevant to this action.  <u>See</u> <u>M&M Medical</u>
<u>Supplies and Service, Inc. v. Pleasant Valley Hospital, Inc.</u>, 981
F.2d 160, 166 (4th Cir. 1992)(expert's conclusory affidavit
lacking facts may not be considered for purposes of summary
judgment); <u>Cavallo v. Star Enterprise</u>, 100 F.3d 1150 (4th Cir.
1996)(excluding expert testimony for purposes of summary judgment
when the conclusions were not sufficiently supported to warrant

_____

[14] The Court declines to give judicial notice to the offered
perception-reaction time at this point, as defendant failed to
establish that the appropriate perception reaction time *in this case*
was not subject to reasonable dispute.  Fed. R. Evid. 201(b)("a
judicially noticed fact "must be one not subject to reasonable dispute
in that it is either (1) generally known within the territorial
jurisdiction of the trial court or (2) capable of accurate and ready
determination by resort to sources whose accuracy cannot reasonably be
questioned.")

their introduction into evidence); <u>Solis v. Prince George's</u>
<u>County</u>, 153 F.Supp.2d 793, 798 (D. Md. 2001)(unsworn affidavit of
expert and fact witnesses would not be considered for purposes of
summary judgment).  Because defendant failed to submit any
evidence which can be considered for the purposes of summary
judgment on point, the Court will not consider whether
defendant's perception/reaction time established that he did not
have any opportunity to respond to plaintiff's unexpected
maneuvers.

     As a result, reviewing the record in the light most
favorable to the non-moving party, a reasonable factfinder could
conclude that defendant did not take reasonable actions available
to him to attempt to avoid the risk of collision.  Until hearing
the testimony of defendant and any testimony on the
perception/reaction that might be admitted, the Court is not
prepared to find defendant's actions did not violate Rule 8 of
the Inland Navigational Rules.

          5.  <u>Rule 13 and 16</u>

     Finally, plaintiffs argue that defendant violated Rules 13
and 16 of the Inland Navigational Rules.  Under Rule 13,
"[n]otwithstanding anything contained in Rules 4 through 18, any
vessel overtaking any other shall keep out of the way of the
vessel being overtaken. A vessel shall be deemed to be overtaking
when coming up with another vessel from a direction more than

22.5 degrees abaft her beam; that is, in such a position with reference to the vessel she is overtaking, that at night she would be able to see only the sternlight of that vessel but neither of her sidelights.  Any subsequent alteration of the bearing between the two vessels shall not make the overtaking vessel a crossing vessel within the meaning of these Rules or relieve her of the duty of keeping clear of the overtaken vessel until she is finally past and clear."  33 U.S.C. § 2013.

Under Rule 16, "every vessel which is directed to keep out of the way of another vessel shall, as far as possible, take early and substantial action to keep well clear."  33 U.S.C. § 2016.  "The rules of navigation do not prescribe how the burdened vessel is to keep out of the way, but the proper and necessary mode may be to simply hold back or to alter its course."  CJS Collide § 41 (2006).

Rule 13 and 16 do not impose strict liability on the give-way vessel for all collisions.  <u>Slobodna Plovidba v. King</u>, 688 F.Supp. 1226, 1235 (W.D. Mich. 1988).  If an overtaking vessel, without signal, comes so close to the overtaken vessel that sudden change of course by the latter may bring about a collision, the fault is that of the overtaking vessel.  <u>See M.J. Rudolph</u>, 292 F. 740, 742 (2d Cir. 1923).  However, the vessel "is not required to keep out of the way so as to avoid a collision no matter what unexpected or improper maneuver the stand-on vessel

makes." <u>Id.</u> (citing <u>Long Island R. Co v. Killien</u>, 67 Fed. 365, 368 (2d Cir. 1895); <u>Williams-McWilliams Industries, Inc. v. F&S Boat Corporation</u>, 286 F.Supp. 638, 642 (E.D. La. 1968)(give-way vehicle did not assume the risk of the overtaken vessel grounding or the subsequent improper maneuvering or navigation on the part of its crew); <u>Daniels v. Trawler</u>, 294 F.Supp. 228, 232 (E.D. Va. 1968)("The law does not impose upon an overtaking vessel the obligation of anticipating improper navigation on the part of the other vessel."); <u>Spencer v. The Dalles, P. & A. Navigation Co.</u>, 188 F. 865, 867 (9th Cir. 1911)(it is the duty of the overtaking vessel to keep out of the way of the overtaken vessel, and the correlative duty of the leading vessel to keep her course).

At the motions hearing, plaintiffs argued that defendant's jet ski was the overtaking vessel, because after plaintiff Moore slowed down her jet ski to look for defendant, defendant was going faster than plaintiff Moore.  However, even taking the evidence in the light most favorable to the non-moving party, the record does not establish whether plaintiff Moore slowed down her jet ski for a sufficient period of time to put defendant on notice that he was the overtaking vessel.

However, the Court need not decide whether defendant's jet ski was an overtaking vessel.  Even if defendant was the overtaking vessel, he was not obligated to keep out of plaintiff Moore's jet ski after the overtaken vessel unexpectedly went into

27

a sudden, improper 180 degree turn.  As a result, the Court concludes that no reasonable factfinder could find that defendant violated either Rule 13 or 16 of the Inland Navigational Rule.

B.  Whether Defendant's Violations of the Inland Navigational Rules were a Cause of the Collision

Because a reasonable factfinder could find defendant violated Rules 6 and 8 of the Inland Navigational Rules, the burden then shifts to defendant.

If plaintiff Moore also violated a relevant statutory provision, the court may apportion fault between the parties, "unless either party proves that its statutory violation was not a substantial contributing cause of the collision."  Stolt Achievement, Ltd. v. Dredge B.E. Lindholm, 447 F.3d 360, 364 (5th Cir. 2006).   Otherwise, defendant must establish that his actions were not a cause of the accident.  The Pennsylvania, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1873); National Shipping Co. of Saudia Arabia v. Moran Mid-Atlantic Corp., 924 F.Supp. 1436, 1450 (E.D. Va. 1996)(citing 8 Benedict on Admiralty § 3.02[B][4]); Crowley American Transport, Inc. v. Double Eagle Marine, Inc., 208 F.Supp.2d 1250, 1264 (S.D. Ala. 2002).

Defendant alleges that plaintiff Moore's actions are the sole cause of the accident.  (Paper No. 59 at 3).  Moreover, defendant contends that plaintiff was per se negligent because she drove her jet ski without a Maryland safety card, in

violation of the Maryland Personal Watercraft Regulations. (Paper No. 55 at 5).[15]

However, the Court need not decide at this time whether plaintiff violated any statutory provision or was otherwise negligent,[16] because a genuine issue of material fact exists as to whether defendant's violations of the Inland Navigational Rules occurred.  If such a violation was found and it was found to be a cause or substantial contributory cause of the collision the Court then, of course, would have to apportion fault between the parties.

While plaintiff Moore violated the Maryland Personal Watercraft Regulations and may well have violated some of the Inland Navigational Rules herself in acting negligently by operating the jet ski at an unsafe speed and in a reckless fashion without any training or experience, the Court is not willing to say that the defendant's failure to drive the jet ski at a safe speed or take reasonable actions to avoid the risk of collision if found, was not a cause or a substantial contributory cause of the accident.

_____

[15] The Court would be interested in any authorities on the question whether the lack of the boater safety license (independent of any actual negligent action) would comprise a statutory violation so as to trigger an apportionment.

[16] For the same reasons, the Court need not address at this time whether or not plaintiff's failure to comply with the Maryland Personal Watercraft Violations is negligence per se or merely evidence of negligence.

## IV.   <u>Conclusion</u>

For the foregoing reasons, defendant's motion for summary judgment is hereby GRANTED in part insofar as violations of Rules 5, 7, 13 and 16 and DENIED in part, as to Rules 6 and 8.


Date: _8/24/06_____                    _____/s/_____
                                       Susan K. Gauvey
                                       United States Magistrate Judge